Filing # 257425432 E-Filed 09/18/2026 06:30:57 PM

IN THE EIGHTEENTH JUDICIAL CIRCUIT COURT
IN AND FOR SEMINOLE COUNTY, FLORIDA

CHELSEA TRUESDELL,

Plaintiff,

v. Case No. **2026CA002085**

CITY OF ALTAMONTE SPRINGS,
and JAMES RIGGS, individually,
and in his capacity as Police Chief,

Defendants.
_________________________________/

**PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, CHELSEA TRUESDELL, pursuant to Florida Rules of Civil Procedure 1.100 and 1.110, files this Complaint and Demand for Jury Trial against Defendants, CITY OF ALTAMONTE SPRINGS (hereafter "the City") and JAMES RIGGS, individually and in his capacity as Police Chief ("Riggs"), collectively ("Defendants"), and alleges the following:

UNOFFICIAL

**NATURE OF THE ACTION**

1. Plaintiff brings this action for violation of her civil rights pursuant to 42 U.S.C. § 1983 via the Fourteenth Amendment to the U.S. Constitution, and the torts of intentional infliction of emotional distress and tortious interference with a business relationship.

**JURISDICTION AND VENUE**

2. This Court has jurisdiction because Plaintiff resided and was employed in Altamonte Springs, Florida, and the unlawful actions by the employer took place in Altamonte Springs, which is located in Seminole County in the Eighteenth Judicial Circuit of Florida.

3. Jurisdiction is also authorized by 28 U.S.C. § 1343, which grants Florida courts jurisdiction over federal civil rights claims.

4. Venue is proper because Plaintiff's claim arose in Seminole County and Defendant's place of business is in Altamonte Springs in Seminole County, and the acts in question took place in Seminole County, which is in the Eighteenth Judicial Circuit of Florida.

**PARTIES**

5. Truesdell is a female who was employed by the City as a Crime Scene Technician from October of 2022 until she was wrongfully forced to resign on March 9, 2023.

6. The City provides government services for the municipality of Altamonte Springs, Florida.

7. These services include law enforcement protection by the Altamonte Springs Police Department ("Police Department" or "APD"), which is a branch of City government.

8. James Riggs was the Chief of Police in Altamonte Springs and the primary decisionmaker for the police department during the events in question.

**COMPLIANCE WITH PROCEDURAL REQUIREMENTS**

9. Plaintiff has complied with all procedural requirements necessary for bringing this lawsuit.

10. Plaintiff has complied with the notice requirements of Fla. Stat. § 768.28 in that she served written notice to Defendants on June 2, 2024 that informed them of the allegations against them and the Plaintiff's intent to file a lawsuit if they were not corrected. The notice provided an opportunity for the Defendants to settle all claims prior to the filing of this lawsuit.

11. Defendants, however, rejected Plaintiff's attempt to resolve this matter.

**FACTUAL ALLEGATIONS**

12. Truesdell performed her job as a Crime Scene Technician successfully until her termination.

UNOFFICIAL

13. Plaintiff received positive evaluations and commendations from supervisors for her work helping solve crimes and for her community service activities.

14. This work included investigating crimes scenes, preserving evidence and testifying in court against accused criminals.

15. Her accomplishments also included pioneering in the use of law enforcement body cams to be used as evidence to help convict criminals.

16. As a Crime Scene Technician, Truesdell was not a sworn law enforcement officer, but rather was considered a "civilian" employee.

17. Based on her positive job performance, Defendants agreed to train Truesdell to be a sworn law enforcement officer by sponsoring her enrollment in the Florida Law Enforcement Academy at Seminole State College ("the Academy").

18. Truesdell was told by supervisors during her employment that she had the potential to become a leader at the police department.

19. After enrolling in the Academy, Truesdell was chosen by her peers to be class leader.

20. However, before completing the program at the Academy, Defendants terminated Truesdell after accusing her of violating the City's Driver and Information Database ("DAVID") policy.

21. DAVID is a computer information system used by law enforcement personnel to check background information of potential criminal suspects or persons being investigated.

22. Truesdell's dismissal was carried out in a manner that was meant to severely punish her, not merely terminate her employment, and to maliciously retaliate against her for challenging

UNOFFICIAL

the charges against her, as well as prevent her from ever obtaining employment in law enforcement again.

23. The dismissal by the Defendants was conducted in a vindictive and cruel manner that was intended to inflict maximum emotional pain, smear Truesdell professionally, and destroy her career in law enforcement.

24. Defendants' unwarranted actions caused Truesdell extreme emotional distress and trauma, which led to her having an emotional breakdown resulting in hospitalization.

25. To this day, Truesdell experiences ongoing migraine headaches and anxiety, and requires medication to sleep at night, as a direct result of the emotional trauma inflicted by the City.

26. This parade of horrors began innocently enough when one of Truesdell's co-workers sent her a text message with a picture of a female applicant to the Police Department taken from its DAVID database.

27. The co-worker, Briana Wolfinger, was a Senior Crime Data Analyst, whose regular job duties included utilizing the DAVID database. Wolfinger was trained in the use of the DAVID system, while Truesdell was not.

28. Wolfinger texted the picture of the applicant to Truesdell unsolicited. At no time did Truesdell request that the photograph or any other information from DAVID be sent to her.

29. In addition to not initiating the transaction, Truesdell at no time entered or utilized the DAVID database.

30. Plaintiff had no idea that simply accepting a photograph would unleash a fury of retaliation and retribution so severe and so harsh that it would cost Truesdell her job, destroy her professional career, and damage her personal relationships.

UNOFFICIAL

31. The picture that is the source of this controversy involved an applicant from the Winter Park Police Department.

32. Truesdell viewed the picture and discussed the applicant with Wolfinger and showed the picture to a fellow cadet at the Academy. She also exchanged text messages privately about the applicant with Wolfinger.

33. The information about the applicant, however, was not shared with any other employees at the police department or with anyone in the public.

34. Truesdell at no time intended to disclose any confidential information about the applicant to anyone in the workplace or in the public.

35. The City immediately initiated an internal affairs investigation, a procedure normally reserved for serious policy violations, not common disciplinary matters.

36. This procedure was launched without notifying Truesdell of the due process rights normally provided in internal affairs inquiries.

37. The due process rights are set forth in the Law Enforcement Officer's Rights, Fla. Stat. § 112.532 and City personnel policies.

38. Although Truesdell was not a sworn law enforcement officer, she was subjected to the rigors and formalities of a paramilitary investigation without being warned or advised of the procedural safeguards to which she was entitled under such a procedure.

39. The investigation numbered 23-0686-01/FSN#2546(B) was commenced without informing Truesdell of the details of all of the charges against her, without providing her with statements of the witnesses who were questioned, and without providing her the right to have legal counsel or another representative present during the initial interview. All of these safeguards are guaranteed under the Law Enforcement Officer's Rights.

UNOFFICIAL

40. Investigators also seized Truesdell's personal cellular phone without a warrant and ordered her to turn over her personal text messages that were unrelated to any work assignment, which was a direct violation of her privacy.

41. Defendants initially claimed that Truesdell was not entitled to due process or procedural safeguards because she was not a sworn law enforcement officer.

42. As a Crime Scene Technician, Truesdell was a civilian employee, and as such, Defendants claimed she was not entitled to the protections provided by the Law Enforcement Officer's Rights in Fla. Stat. § 112.532.

43. Eventually, Defendants grudgingly granted Truesdell some procedural safeguards at the request of her attorney, but by that time they had already determined the outcome of the investigation.

44. Truesdell was legally entitled to certain due process rights from the outset of the investigation.

45. Internal affairs investigations, according to the City's own policies, involve serious allegations of misconduct or extreme circumstances which may involve complex or protracted investigations.

46. The sensitive or serious nature of these investigations requires that due process protections be provided, regardless of the employee's position at the police department.

47. Internal affairs investigations involve rigorous, intimidating, aggressive and invasive paramilitary-style inquiries.

48. The disciplinary process for non-sworn employees, including Crime Scene Technicians, on the other hand, normally involves less formal and gentler investigations by human

UNOFFICIAL

resource professionals rather than law enforcement investigators skilled at interrogation techniques.

49. The level of due process required did not depend on whether an employee is a sworn law enforcement officer or a civilian employee. Rather, it was based on whether the employee was being subjected to a formal internal affairs investigation or a routine human resources disciplinary process.

50. If in fact Truesdell was not entitled to any of the due process protections because of her civilian status, then she should not have been subjected to an internal affairs investigation. Instead, she should have been disciplined as a civilian, like any other non-sworn City employee.

51. Her actions should have been reviewed under personnel policies by human resources professionals and subjected to the City's progressive discipline policies.

52. However, City officials wanted it both ways. They wanted to discipline Truesdell as a civilian with no due process rights and still subject her to the impositions of a rigorous internal affairs investigation.

53. Before Truesdell was notified that she was the subject of an internal affairs investigation, she realized the importance of protecting the confidentiality of the DAVID data.

54. In an effort to minimize exposure of the photograph and ensure that the information would not be seen by anyone else, Truesdell deleted part of the text message stream involving the comments to and from Wolfinger about the applicant whose picture was on the DAVID database.

55. At the time she deleted the information, Truesdell had not yet been notified that she was the target of an internal investigation.

56. Her action was a good faith attempt to protect the confidentiality of the DAVID data.

UNOFFICIAL

57. Defendants falsely accused Truesdell of attempting to impede the investigation by deleting information necessary to the inquiry and wrongly accused her of insubordination.

58. Defendants knew or should have known that this allegation was clearly false, since the text messages were deleted before Truesdell was notified of the internal investigation.

59. The first time Truesdell was questioned by investigators in the matter was on February 8, 2023. She deleted the text message to Wolfinger, however, on or about February 2, 2023, before she was notified that she was the target of an internal investigation.

60. When Truesdell was interrogated by investigators, she attempted to explain why she deleted the text messages and made no attempt to conceal her actions.

61. The insubordination charge was manufactured to justify terminating Truesdell's employment, even though until that time she had been a model employee.

62. Truesdell had an exemplary record throughout her professional career and consistently earned positive performance evaluations both at the City and with her prior employer, the Ocala Sheriff's Office.

63. It is undisputed that Truesdell never entered into, utilized, engaged with, or used the DAVID system at any time during her employment with the City.

64. In the incident at issue in this case, Truesdell received via text message unsolicited data from a senior employee who was utilizing the DAVID database to research the background of applicants applying for jobs with the Altamonte Springs Police Department.

65. The employee who sent the data to Truesdell was trained in the use of DAVID. Utilizing the DAVID database was a part of her job.

UNOFFICIAL

66. Truesdell, on the other hand, had never received any training whatsoever in the use of DAVID, and, although she had a general knowledge of DAVID, was unfamiliar with the specific policies governing the system which she had never utilized.

67. Defendants failed to provide Truesdell with adequate training on the use of DAVID and then ended her career when she made an error involving DAVID information.

68. Defendants' actions are more egregious given that they went beyond merely terminating Truesdell's employment. They attempted to smear Truesdell's professional reputation and destroy her career in law enforcement.

69. Defendants launched an internal investigation with a fury and rushed to judgment to punish Truesdell after she challenged her due process rights.

70. Prior to this incident, Truesdell had been a model employee and had never been written up or disciplined.

71. It was Truesdell's first alleged violation of City policy, and, for that reason, did not warrant termination under the City's progressive disciplinary policy.

72. In addition to terminating her employment, Defendants caused Truesdell to incur other damages.

73. The City withdrew its sponsorship of Truesdell at the Academy. Truesdell was close to completing her training to become a sworn law enforcement officer, which would have advanced her career in her chosen field both professionally and economically.

74. Defendants' actions diminished Truesdell's professional reputation and cost her financially for years to come.

UNOFFICIAL

75. Defendants' retaliation against Truesdell for challenging the way it conducted the internal affairs investigation included taking active steps intended to prevent Truesdell from ever working in the field of law enforcement again.

76. Chief Riggs told Truesdell that she was being placed on a list of discredited witnesses that would bar her from ever testifying in court in a criminal case. This action would make it impossible for Truesdell to function as a crime scene technician for other agencies.

77. This so-called Brady List is a data base of law enforcement officers who are branded unreliable or untruthful, and therefore, not trustworthy or credible enough be called by the State Attorney as witnesses to testify in criminal cases.

78. The Brady List designation is a scarlet letter that would ensure that Truesdell would never work in the field of law enforcement again.

79. The retaliation also included directives from senior officers at the police department, including the police chief, to City employees to avoid contact with Truesdell and to refrain from engaging with her in any social situations, and to exclude her from their personal friendships.

80. The result was that after losing her job and her career, Defendants directed Truesdell's associates and co-workers, which included her friends, peers and supervisors, not to speak to her or associate with her in any way, cutting her off from any support at a time when she was most vulnerable.

81. The isolation was so complete that it could only have occurred if there was a directive or order from the top of the chain of command to avoid contact with Truesdell.

82. Defendants knew the effect of their isolation order would prevent Truesdell from associating with friends and co-workers.

UNOFFICIAL

83. Defendants maliciously carried out their goal of destroying Truesdell's professional career and her personal life.

84. As a result of the intentional actions by Defendants, Truesdell suffered severe emotional distress and mental anguish.

85. Truesdell was completely devastated by the swiftness and thoroughness with which her entire life had been destroyed almost overnight.

86. A decade of law enforcement work and study, including university classes with honors, and distinguished work with two law enforcement agencies, was wiped out for the act of viewing an unsolicited photograph of a stranger from the police data base.

87. The emotional distress was so severe that Truesdell had to be hospitalized.

88. As a result of the acts of Defendants, Truesdell suffered damages, including lost wages and benefits, severe emotional distress and mental anguish, lost retirement, a loss of her professional reputation, loss of her career, and loss of the ability to earn future wages.

89. Truesdell also has been forced to incur attorney's fees in order to vindicate her rights.

## COUNT I
## 42 U.S.C. § 1983 via the U.S. Constitution, 14th Amendment, Due Process Clause
## Deprivation of Liberty Interest
## Against Both Defendants

90. Plaintiff realleges and incorporates by reference paragraphs 1 through 89 into Count I of this Complaint.

91. Plaintiff is suing Defendants pursuant to 42 U.S.C. § 1983 via the 14th Amendment to the U.S. Constitution for violations of her civil rights.

UNOFFICIAL

92. The violations were caused by a policy, regulation or decision officially adopted and promulgated by the City and James Riggs, police chief at the time.

93. The City, through its decisionmakers, including the Police Chief and City Manager, while acting under color of law, including statutes, ordinances, regulations, customs and usage, deprived Truesdell of her constitutional rights to prevent her from ever working in the field of law enforcement, her chosen profession.

94. The decision to subject Truesdell to an aggressive internal affairs investigation without initially notifying her of her rights, terminating her employment for a minor first offense ignoring the progressive discipline policy, and subjecting Truesdell to being blackballed by other law enforcement agencies was done deliberately to deprive Truesdell of the ability to make a living in her profession.

95. The decisionmakers, including the Police Chief, the highest ranking officer and decisionmaker at the police department, and City Manager Frank Martz, who approved the decisions by the Police Chief, to smear Truesdell's reputation, isolate her from her friends, and prevent her from working in the field of law enforcement.

96. Their decisions were made under color of state law or City ordinances, or by policies that were directed by City leaders and had the force of law and the effect of depriving Truesdell of her rights.

97. The violations were the result of official policies, practices or customs of the City designed to deprive Truesdell of her constitutional rights.

98. Defendants also violated Truesdell's constitutional rights by failing to train her in the use of the DAVID system, and then severely punishing her for an alleged violation.

UNOFFICIAL

99. Furthermore, Defendants violated Truesdell's Fourth Amendment right against unreasonable searches and seizures by seizing her personal phone and confiscating personal text messages between Truesdell and Wolfinger, the person who sent her the DAVID information.

100. The information in the text messages was not shared with any other employees or the public, and therefore, did not justify seizing Truesdell's personal property to obtain her personal messages that were not related to work.

101. Defendants' action of initiating an aggressive internal affairs investigation without following its own due process requirements for such inquiries also violates the due process clause of the Fourteenth Amendment.

102. The actions by Defendants that deprived Truesdell of her right to employment involved both procedural and substantive due process rights.

103. Although Defendants eventually allowed Truesdell to review the statements against her and have an attorney present, the investigation was launched before she was afforded those rights. As a result, the City had already determined her fate and rushed to judgment before she had a chance to present her case with appropriate due process.

104. By initiating initial interrogation before advising Truesdell of her rights, the City questioned her before she had to opportunity to evaluate the accusations against her, which forced her to respond before she was prepared to do so.

105. Even when due process was afforded, the procedures were intimidating and oppressive and led to the deprivation of Truesdell's fundamental rights.

106. The Police Chief and his officers, with approval of the City Manager, used the power and authority derived from their government positions to deprive Truesdell of her constitutional rights and to punish her for questioning the procedures used in the investigation.

UNOFFICIAL

107. The constitutional rights violated by Defendants were clearly established so that a reasonable person would have known they were violating Truesdell's civil rights and directly causing her injury.

108. The practice of the department of following the the directives of the Police Chief and City Manager to blackball certain individuals who questioned their actions was so entrenched as to have the force of law and explicitly authorize their unconstitutional acts.

109. Defendants placed Truesdell on a government blacklist which effectively precludes her from obtaining employment with any other law enforcement agency.

110. Defendants' actions deprived Truesdell of the liberty interest of continuing to work in her chosen field of employment.

111. Defendants deprived Truesdell of her liberty interest in continued employment by not only terminating her employment with the City, but by making public comments that stigmatized Truesdell and damaged her reputation and essentially blackballed her from ever working in the field of law enforcement.

112. The derogatory statements by Defendants disparaged Truesdell's reputation among supervisors and colleagues at the police department and the Academy, directed employees and recruits to avoid speaking to and associating with Truesdell, and notified the State Attorney that Truesdell should be included on a list of individuals who should not be allowed to testify as a witness for the police department.

113. Defendants impinged on Truesdell's liberty interest in maintaining gainful employment by publicly and falsely attaching a badge of infamy to her without providing a reasonable opportunity to clear her name.

UNOFFICIAL

114. Defendants deprived Truesdell of a liberty interest in working and earning a living in her chosen profession by terminating her employment in a way that stigmatized her and irretrievably damages her reputation in the field of law enforcement without a reasonable opportunity for her to clear her name.

115. Defendants' actions seriously damaged Truesdell's standing and association in the community by impugning her good name, reputation, honor and integrity.

116. Defendants' actions also foreclose Truesdell's freedom to pursue other employment opportunities.

117. As a direct result of Defendants' actions, Truesdell suffered damages, including loss of pay and benefits, severe emotional distress, and she was forced to incur attorney's fees to vindicate her rights.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiff respectfully asks this Court to award damages for the following:

(a) lost wages and benefits;

(b) front pay;

(c) compensatory damages for mental and emotional distress;

(d) compensation for damage to her professional and personal reputation;

(d) interest;

(e) attorney's fees pursuant to 42 U.S.C. § 1988; and

(f) any other relief the Court deems necessary.

UNOFFICIAL

**COUNT II**
**Intentional Infliction of Emotional Distress**
**Against Both Defendants**

118. Plaintiff re-alleges and incorporates by reference into Count II paragraphs 1 through 89 of this Complaint.

119. The conduct by Defendants was extreme and outrageous and intended to cause Truesdell emotional distress, and did in fact cause Truesdell extreme emotional distress and psychological harm.

120. The emotional distress inflicted by the City was so severe, that it caused Truesdell to have an emotional breakdown which resulted her being hospitalized.

121. The actions by Defendants were intentional or reckless, and Defendants knew or should have known that their actions would cause Truesdell severe emotional distress.

122. Defendants acted with reckless disregard for the high probability that its actions would cause Truesdell extreme emotional distress.

123. Defendants' conduct was so outrageous in character, and so extreme in degree that it went beyond all bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community.

124. As a result of the actions by Defendants, Truesdell not only lost her job, but her entire career was destroyed by Defendants.

125. This caused her to suffer anxiety and depression, including feelings of worry, sadness and hopelessness that affected her ability to sleep and poisoned her relationships.

126. Defendants only terminated her employment, by placing in her record false accusations designed to ruin her professional reputation in the law enforcement community, ensured that no other law enforcement agency would ever hire her or use her as a witness.

UNOFFICIAL

127. Additionally, Defendants directed all other employees in the police department to disassociate themselves from Truesdell, forcing them to sever personal relationships and friendships that Truesdell had cultivated over the years during her employment.

128. Defendants ensured that Truesdell would have no professional friends during a time where her career was destroyed and she sorely needed a support system.

129. Truesdell also experienced signs of post-traumatic stress disorder for months after the incidents, including flashbacks and avoiding places that reminded her of the police department.

130. Truesdell also experienced an increase in the incidents and intensity of migraine headaches directly related to her treatment by the Defendants.

131. The emotional distress Truesdell suffered was a direct result of the actions of Defendants and was so severe that no reasonable person could be expected to endure it.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiff respectfully asks this Court to award damages for the following:

(a) lost wages and benefits;

(b) front pay;

(c) compensatory damages for mental and emotional distress;

(d) interest;

(e) medical expenses

(f) reasonable attorney's fees and costs; and

(g) any other relief the Court deems necessary.

UNOFFICIAL

**COUNT III**
**Tortious Interference With a Business Relationship**
**Against Both Defendants**

132. Plaintiff re-alleges and incorporates by reference into Count III of this Complaint paragraphs 1 through 89.

133. Plaintiff was attending the Academy and was being trained to become a sworn law enforcement officer at the time she was terminated by the City.

134. A promotion to the position of sworn police officer would have resulted in a significant increase in salary and benefits, and other opportunities for career advancement for Truesdell.

135. Truesdell had a business relationship with the Academy and a designated date for graduation.

136. The City sponsored Truesdell's enrollment in the Academy, and therefore, was aware of her business relationship with the Academy.

137. Defendants had knowledge of Truesdell's impending graduation date and took deliberate action intended to breach her relationship with the Academy.

138. Defendants intentionally and unjustifiably interfered with Truesdell's business relationship with the Academy, which resulted in damages to Truesdell in the form of her being expelled from the Academy shortly before her pending graduation.

139. Defendants acted intentionally to interfere with the relationship between Truesdell and the Academy.

140. Defendants directed other cadets enrolled in the Academy and employees at the police department to shun Truesdell and to avoid contact with her.

UNOFFICIAL

141. Defendants created the impression among instructors and cadets that Truesdell was less than professional and disparaged her reputation in the field of law enforcement in the minds of her colleagues, supervisors, students and instructors at the Academy, and fellow law enforcement professionals.

142. The actions by Defendants not only terminated Truesdell's career at Altamonte Springs, but destroyed her chances of becoming a sworn law enforcement officer with any other law enforcement agency.

143. Defendants' actions branding Truesdell with defamatory allegations disparaging her reputation have made it impossible for Plaintiff to obtain employment in the field of law enforcement.

144. Truesdell would have benefitted from her relationship with the Academy if Defendants had not interfered.

145. Furthermore, Truesdell had reasonable expectations that she would have a prospective economic relationship with other law enforcement agencies after completing the Academy.

146. Defendants deliberately interfered with Truesdell's prospective business relationship with other law enforcement organizations following her graduation from the Academy.

147. As a result of the actions of Defendants, Plaintiff incurred damages and was forced to hire an attorney to vindicate her rights.

UNOFFICIAL

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff asks this Court to award damages for the following:

(a) lost wages and benefits;

(b) front pay;

(c) compensatory damages for mental and emotional distress;

(d) interest;

(e) medical expenses;

(f) reasonable attorney's fees and costs; and

(g) any other relief the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues and counts triable before a jury

Respectfully submitted,

**[s] Alfred Truesdell**
ALFRED TRUESDELL
Florida Bar No. 885363
*Truesdell Law*
3521 Tyngsbourgh Drive
DeLand, Florida 32720
(407) 920-7392
truesdelllaw@gmail.com
Attorney for Chelsea Truesdell

UNOFFICIAL